E. I. DUPONT CO. v. JOHN SHIELDS CONST. CO.

(Circuit Court, E. D. Pennsylvania. June 5, 1908.)

No. 29.

SALES—TRANSFER OF TITLE—WAIVER OF DEFAULT IN PAYMENT OF PRICE ON DELIVERY.

Defendant corporation purchased two locomotives from petitioner, to be settled for on delivery by a cash payment and the execution of two notes running 60 and 90 days. The locomotives were delivered, and were used by defendant until a receiver was appointed for it 7 months later, although no settlement was made for them until 5 months after their delivery, when defendant made a cash payment, executed notes for the remainder of the price, and accepted a lease from petitioner, by which the latter was to retain title to the locomotives until full payment. *Held*, that under the law of Pennsylvania the failure to promptly exercise its right to reclaim the property after defendant's default in payment was a waiver of such right, and the title thereupon passed to defendant, leaving it a debtor for the price; that, having no title to the property at the time it was given and accepted, petitioner acquired no rights in the property by the lease, either of ownership or by way of security.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 43, Sales, §§ 552–556.]

In Equity. On exceptions to report of referee.

R. W. Archbald, Jr., and L. H. Van Dusen, for exceptions.
R. Stuart Smith, opposed.

J. B. McPHERSON, District Judge. I have read with attention the testimony that was taken by the learned referee (Sydney Young, Esq.), and I agree fully with his findings of fact, which are as follows:

"That on May 10, 1905, Wonham & Magor, agents for the H. K. Porter Company, acknowledged by letter to the John Shields Construction Company an order received from them for two locomotives to be delivered to the John Shields Construction Company, of Quarryville, Pa., and in said letter said in conclusion:

" 'Terms of sale same as last order placed through Philadelphia with the H. K. Porter Company.'

"That the order for these two locomotives was confirmed in a letter addressed to Wonham & Magor under date of May 13, 1905, signed by the John Shields Construction Company, and in the language:

" 'We hereby confirm our verbal order to you of several days ago for two 9x12 "–36" gauge Porter locomotives, to be delivered at Quarryville, Pa., by Pa. R. R.'

"That on May 18, 1905, the H. K. Porter Company sent an invoice to the John Shields Construction Company, in which the terms of the sale were given as follows:

" 'Terms: One-third cash on shipment, one-third 60 days note with 6% interest, and one-third 90 days note with 6% interest.'

"That on May 24, 1905, Wonham & Magor, representing the H. K. Porter Company, wrote the John Shields Construction Company, inclosing a duplicate invoice and bill for the locomotives in question, and said:

" 'In accordance with terms of sale, we would be obliged by your sending us check by return of mail for one-third of the invoice amount, and the balance in 60 and 90 days notes, with interest at 6% added, notes to be from date of shipment, viz., May 18th.'

"That in accordance with the agreement the two locomotives in question were shipped by the H. K. Porter Company to Quarryville, Pa., and were received by the John Shields Construction Company some time in the latter part of May, 1905.

"That the locomotives remained in the possession of the John Shields Construction Company and were used by them on the work they were doing on the Pennsylvania low-grade division from the date they were received up until the date when the John Shields Construction Company went into the hands of a receiver, in December, 1905.

"That no payment was made by the John Shields Construction Company on account of these locomotives until October 16, 1905.

"That from the date of the sale up to October 16, 1905, the H. K. Porter Company and its agents, Wonham & Magor, were diligent and persistent in demanding payment. This is shown by the letters addressed to the John Shields Construction Company by Wonham & Magor under date of June 5, 1905, July 7, 1905, September 5, 1905, and October 12, 1905, and by the H. K. Porter Company under date of July 27, 1905, August 12, 1905, September 20, 1905, and October 4, 1905. (Copies of all the letters referred to will be found in Exhibit A.) The language in the letter of July 7, 1905, referred to above, was in part:

"'As same [settlement] is now long past due, we would appreciate it very much if you would give this matter your immediate attention, sending us cash payment and notes in settlement by return of mail.'

"In the letter of July 27, 1905, referred to above, appears the following:

"'We trust that you will make settlement of this account with Messrs. Wonham & Magor at once and greatly oblige.                    H. K. P. Co.'

"Again in the letter of September 5, 1905, referred to above:

"'We have asked you a number of times to kindly favor us with a settlement of some character on this order, but, up to the present time, we have had no word from you of any kind. "Pittsburg" state that they must have some definite statement from you. Otherwise, while they regret to very much, they will have to take some action to protect themselves.'

"That there is nothing in the testimony or correspondence to show that the H. K. Porter Company at any time asked for a return of the locomotives, and that the locomotives were at no time after delivery, up to the date when the John Shields Construction Company went into the hands of a receiver, out of the possession or control of the John Shields Construction Company.

"That the witness Lanham, an employé of Wonham & Magor, called upon the John Shields Construction Company on numerous occasions, attempting to make a settlement, and that he was unable to obtain a satisfactory settlement.

"That the witness Stimpson, who was called on behalf of the H. K. Porter Company, stated (page 2), in reply to the question by the counsel for the petitioner:

"'Q. Won't you please tell the referee all that you know of that transaction?

"'A. There was a sale made to them previous to my coming into their employ, two locomotives. The agreement was for payment in part cash, balance in notes, sixty and ninety days.'

"That the witness Stimpson testified that on numerous occasions he saw Mr. Carter, treasurer of the John Shields Construction Company, in attempting to get a settlement from said company. That he did not see John Shields, because, when he called at his office, he was told that Mr. Shields was not in town. That finally, late in September or early in October, 1905, the witness saw John Shields, and (page 4):

"'He spoke of the John Shields Company, was rather proud of the name John Shields (and had good reason to be), and he spoke of their perfect ability to meet their obligations in every way, and I told him I hadn't the slightest doubt that was so, but as we had been six months or so, or several months, without anything on paper, we would like something to protect us, and then he agreed to signing the lease and the notes, and I went and got the notes and he signed them.'

"That said lease was signed by the John Shields Construction Company, John Shields, president, on October 16, 1905. That said lease was in the usual form of car lease, and that it was acknowledged before a notary public on the date of its execution, and that at the time of the execution of said lease (Exhibit D) $1,000 was paid in cash, and two notes of 60 and 90 days, respectively, were given for the remainder.

"That the note mentioned in the car service agreement (above referred to as 'car lease') as 60 day note dated October 15, 1905, due December 15, 1905, for $2,040.70, has been paid.

"That said lease was recorded on January 9, 1906, in the office for the recording of deeds in and for Lancaster county, Pa., in Deed Book B, vol. 18, p. 281 et seq.

"That, although all diligence was used in attempting to collect the money due, there is nothing in the testimony to show that any artifice or fraud was resorted to by the John Shields Construction Company to prevent the representatives of the H. K. Porter Company from seeing the president or any of the other officers of the John Shields Construction Company, and that, although the witness Lanham said that he was going to see the president of the John Shields Construction Company at his residence at Flemington, N. J., there is nothing to show that he made any attempt to see him at any place other than at his office, and that, although he asked the treasurer to sign the notes and car lease, the treasurer informed him that he had not authority to do so.

"That the only testimony to support the contention that there was any agreement to sign a car lease at the time the locomotives were purchased is found in the testimony of the witness Stimpson (page 4), at a conversation which he said took place at the meeting between himself and John Shields late in September or early in October, 1905. He testified as follows:

"'Q. Did you state to Mr. Shields, Sr., that they were the terms of sale, as you understood them? A. Yes, and I asked him if he would be willing to sign everything—that is, the notes and the car lease—and give me a check. He simply objected to the car lease on the basis of not wanting the name appearing on locomotive; but I told him that was the agreement, the original agreement, and that there was no getting back of it.'

"That this testimony is clearly contradicted by the letters referred to in the earlier part of this report from Wonham & Magor and from the H. K. Porter Company to the John Shields Construction Company. The first letter in which a car lease is mentioned is the letter of September 20, 1905, from the H. K. Porter Company to the John Shields Construction Company, in which they say,

"'As you are aware, and as explained in our letter of August 12th [which letter is not in evidence], these locomotives were sold to be paid for one-third cash on shipment, one-third 60 days note, and one-third 90 days note, notes dated day of shipment and bearing 6% interest, we retaining ownership of the locomotives until final payment by the usual lease or car trust plan. The lease and notes for these locomotives were sent to you through Mr. F. S. Wonham, in New York, but we have never had the lease returned, nor the notes signed and returned, nor have we received the cash payment which was due on the day of shipment.'

"That, there being contradiction as to whether there was any agreement to execute a car lease at the time the sale was made, the referee feels that he must decide, owing to the fact that the preponderance of evidence shows that no such agreement was made at the time of sale, but that it was an afterthought, that the written evidence, as contained in the letters referred to previously, should be given more credence than the testimony of the witness Stimpson. The referee feels that his view on this point is confirmed by the further fact that the witnesses showed that the H. K. Porter Company had the greatest faith in the financial standing of the John Shields Construction Company, and that only after the numerous delays in payment did they become worried, and then the car lease plan suggested itself, as shown by that portion of the testimony of the witness Stimpson (page 4) which says:

"'I told him [John Shields] I hadn't the slightest doubt that was so [that the John Shields Construction Company could meet its obligations], but as we had been six months or so, or several months, without anything on paper, we would like something to protect us, and then he agreed to signing the lease and the notes. * * *'

"That on October 24, 1905, the H. K. Porter Company shipped, via the Adams Express Company, four ownership plates, containing the words 'H. K. Porter Co., Owners,' to the John Shields Construction Company, and that

under date of October 26, 1905, the John Shields Construction Company were written a letter by Wonham & Magor, which instructed them to place these ownership plates one on each side of the cab of each of the two locomotives in question: but that the John Shields Construction Company did not receive notice that these plates had been shipped, and the plates were not received by the John Shields Construction Company until after the said company went into the hands of a receiver, and that they were never put on the said locomotives.

"In conclusion, that at the time of the execution of the car lease in question the H. K. Porter Company did not know of the insolvency of the John Shields Construction Company, and that the John Shields Construction Company went into the hands of a receiver in December, 1905."

I also agree with the referee's first conclusion of law, and I adopt his report thereon (which follows immediately) as the opinion of the court:

"The first question which presents itself for the decision of the referee is whether the car lease agreement would have been binding upon the John Shields Construction Company, had the H. K. Porter Company endeavored to enforce the provisions contained in the car lease agreement. In order that it should be binding, the title to the locomotives in question must have been in the H. K. Porter Company at the time the car lease agreement was executed, to wit, on October 16, 1905. The original contract for the locomotives was entered into by the John Shields Construction Company with the H. K. Porter Company on May 16, 1905. By the terms of that contract the locomotives were sold by the H. K. Porter Company to the John Shields Construction Company. According to the terms of sale, a portion of the purchase price was to be paid upon delivery in cash, and the balance by two notes, one a 60-day note, and the other a 90-day note. The locomotives were delivered at once, and were received and used by the John Shields Construction Company up to the time that company went into the hands of a receiver. The car lease agreement, as noted, was not entered into by the Porter and Shields Companies until the 16th of October, 1905, five months after the original sale. During those five months the H. K. Porter Company repeatedly recognized the sale, by demanding payment of the purchase price, as will be noticed from the language of the letter of May 24, 1905, in which the words appear,

" ' * * * In accordance with terms of sale, we would be obliged by your sending us check by return of mail,' etc.

"And in numerous other letters the same language is used. Then, referring to the testimony of witness Stimpson (page 2):

" 'There was a sale made to them previous to my coming into their employ, two locomotives,' etc.

"Also in the invoice of May 18th the words appear:

" 'Sold to the John Shields Construction Company.'

"And, as seen from the testimony of John A. Carter (pages 9 and 10), the sale was completed by the delivery of the locomotives to the John Shields Construction Company. The terms of the sale not having been complied with by the John Shields Construction Company, the H. K. Porter Company then had a perfect right to retake the locomotives, provided they did so promptly. But they did not retake the locomotives, and the so-called car lease agreement was not executed until, as said above, five months had elapsed, and during that period at no time did they demand a return of the locomotives or assert any right of ownership in them. The question, then is, was there any retransfer of the title to the locomotives prior to the execution of the lease? In no place in the testimony does it appear that there was such a retransfer, and, although the testimony is slightly contradictory, the referee feels compelled to decide that the car lease agreement was an afterthought, which suggested itself to the officers of the H. K. Porter Company when they found that the John Shields Construction Company were in this instance such slow pay. The first mention that appears in the correspondence of the suggestion of having any car lease agreement signed is in the letter of September 20, 1905, from the

Porter Company to the Shields Company. None of the previous letters in evidence refers to such an agreement, and each, in referring to the transaction of May 16, 1905, speaks of it as a sale. The only scintilla of evidence in support of the contention that a car lease agreement was suggested at the time the original agreement was entered into is that testimony given by the witness Stimpson (page 4), when he testified that late in September or early in October, 1905, he saw John Shields, and that the following conversation took place:

" 'He spoke of the John Shields Company, was rather proud of the name of John Shields (and had good reason to be), and he spoke of their perfect ability to meet their obligations in every way, and I told him I hadn't the slightest doubt that was so, but as we had been six months or so, or several months, without anything on paper, we would like something to protect us, and then he agreed to signing the lease and the notes, and I went and got the notes and he signed them.'

"This testimony is so overwhelmingly contradicted by the written evidence, and by the fact that the car lease agreement was evidently an afterthought, which only suggested itself when the Porter Company began to worry about payment on the locomotives, that the referee feels compelled to disregard it. Therefore, in the opinion of the referee, there was a conditional sale, and with the conditional sale the title passed to the vendees, and the title could only have been revested in the vendors by their asserting promptly their right to ownership in the locomotives.

"In the case of Frech v. Lewis, 218 Pa. 141, 67 Atl. 45, 11 L. R. A. (N. S.) 948 (1907; C. P. 5, Philadelphia County), the plaintiff brought an action of replevin against the defendant for two carriages. The facts were that the plaintiff was to furnish the defendant with two carriages, to be paid for on delivery. The plaintiff furnished the defendant with the carriages, and the defendant used them. Frequent demands were made on the defendant for the money, and two months and a half elapsed, and then the plaintiff began an action of replevin for the carriages. The lower court permitted the case to go to the jury, who found in favor of the plaintiff and gave the plaintiff a verdict for the property. The lower court was affirmed by the Superior Court in a divided court of four to three. In reversing the court of common pleas and the Superior Court, Mr. Justice Stewart said:

" 'The settled doctrine of our cases is to the effect that where the contract of sale provides for payment of the purchase price on delivery of the article sold, and the seller delivers the goods, but the buyer fails to pay, the right of property does not pass to the buyer with the possession, but remains with the seller, who may, at his option, reclaim the goods. In some jurisdictions the right of property is held to pass with the delivery unless at the time the right to retake is expressly declared by the seller. We have not gone so far. Our cases proceed on the theory that until payment has been made or waived the contract remains executory, and that delivery in such case is not a completion of the contract, except as an intention to so regard it is expressly declared or can fairly be inferred from the circumstances attending. Possession, however, having passed, and the buyer by the act of the seller having been invested with the indicia of ownership, the policy of our law requires that this situation—possession in one and the right of property in another—shall continue no longer than is necessary to enable the seller to recover the goods with which he has parted. The law gives the seller the right in such case to reclaim his goods, but he must do so promptly; otherwise, he will be held to have waived his right and can only thereafter look to the buyer for the price. The question the present case suggests is, when does this inference of waiver arise? Our authorities admit of but one answer: Except when delayed by trick or artifice, the assertion of the right to reclaim the property must follow immediately upon the buyer's default. This does not mean that the seller must eo instante begin legal proceedings to recover the goods; but it does mean that the seller, when he discovers that his delivery is not followed by payment, as he has the right to expect, is at once put to his election whether he will waive the condition as to payment and allow the delivery to become absolute, or retake the property, and that he is to allow no unnecessary delay in making his choice. The object of the law is not to

multiply his remedies because of his disappointment. He may not continue to hold his right to the goods and at the same time hold the buyer as his creditor. One or the other he must relinquish, and do it promptly, or the law will forfeit his right to elect. Two months and a half elapsed before he began this action of replevin, which was his first assertion of continued ownership of the property. It was not only too late, but his conduct shows that during all this time he was dealing with the defendant as though the latter was his debtor.'

"As under the above decision the H. K. Porter Company did not have the right of ownership in the locomotives, they could not, of course, lease them to the John Shields Construction Company, as the power to execute the lease is predicated upon ownership in the lessor. It is, however. contended by the H. K. Porter Company that they did not assert their right to ownership in the locomotives until the expiration of some four or five months owing to the fact that fraud or artifice was practiced on the part of the John Shields Construction Company; but, after an examination of all the testimony and of the authorities, the referee is of the opinion that there was no fraud or artifice practiced by the John Shields Construction Company, and that this question, therefore, does not enter into the case, and therefore, under the authority of Frech v. Lewis, supra, that the H. K. Porter Company is not entitled to the locomotives in question."

As the referee's decision upon this point disposes of the case completely, I see no occasion to consider his second conclusion. But this remark must not be understood even to intimate a dissent from the views he has expressed in support of such conclusion. It simply means what it says, namely, that under the circumstances it would be superfluous for me to consider his discussion of the second proposition embraced in his report.

The exceptions of the H. K. Porter Company are therefore overruled, and the decision of the referee is confirmed.